**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE APPLICATION OF HIGINI CIERCO NOGUER, RAMÓN CIERCO NOGUER AND JOAN PAU MIQUEL PRATS FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782** | Case No. 18-mc-498 |

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

Applicants Higini Cierco Noguer, Ramón Cierco Noguer and Joan Pau Miquel Prats (the "Shareholders" or "petitioners") respectfully apply for an order of judicial assistance, pursuant to 28 U.S.C. § 1782, appointing Tara J. Plochocki, Esq. as a Commissioner of the Court to facilitate the issuance of subpoenas and the gathering of documentary evidence from J.C. Flowers & Co., which "resides in" or is "found in" the Southern District of New York. The information is sought for use in a criminal legal proceeding filed by the Shareholders in the Magistracy Court of Andorra against the individuals and entities who deprived the Shareholders of the value of their shares in Banca Privada d'Andorra through fraud and abuse of power.

## FACTUAL BACKGROUND

### A. Banca Privada d'Andorra

The Shareholders are the owners of the entity formerly known as Banca Privada d'Andorra ("BPA"). This was a healthy and solvent financial institution undone by the stroke of a bureaucratic pen, thousands of miles away from the tiny principality of Andorra, in the U.S. Department of Treasury. In March 2015, the Financial Crimes Enforcement Network (FinCEN) in the United States issued a "Notice of Finding" in which it announced that BPA was a foreign financial institution of "primary money laundering concern." Declaration of Salvador Capdevila Pallarés ("Pallarés Decl.") ¶ 5. It made this finding without consideration of BPA's internal

audits, compliance files, or any evidence from BPA at all. *Id*. ¶¶ 5-6. Along with this NOF was a Notice of Proposed Rulemaking that would deny BPA access to the U.S. financial system. *Id*. ¶ 6. Before it could make this Rule, FinCEN would afford BPA and anyone else the chance to challenge the factual basis for the finding and save BPA from the consequences of the designation. The Government of Andorra saved FinCEN the trouble. At FinCEN's urging, the Government of Andorra seized BPA and set about systematically destroying its value. *Id.* ¶ 7.

First, the legislature of Andorra created a special agency to take the bank from the Shareholders. Less than one month after the issuance of the Notice in the United States, the General Council of Andorra passed a law to create the State Agency for the Control of Banking Organizations ("AREB" per its initials in Catalan) and endowed it with the power to manage, segregate, and sell, the assets of BPA. *Id.* ¶ 8. AREB promptly appointed joint provisional administrators to carry out these tasks. *Id*. ¶ 9. To determine which assets were "legitimate", AREB hired Price Waterhouse Coopers, and then used an undisclosed standard to segregate out whatever seemed to pass muster. In record speed, the brand-new AREB and its growing bureaucracy reached dizzying determinations. Within weeks, it had determined that BPA had a negative economic value of 103.1 million euros and a negative net asset value of 374.4 million euros. *Id.* The Shareholders maintain that the overwhelming majority of its assets were legitimate, and that it had duly reported instances of suspected money laundering to the national regulator. The seizure of the bank was wholly unwarranted, and AREB's administration of BPA has destroyed nearly all of its value.

What appeared to be clumsy inexperience at first is now clearly fraud. AREB and its agents systematically drained BPA of its good assets and loaded them up with worthless securities created out of thin air. The Andorran government created Vall Banc SAU ("Vall

Banc") to hold BPA's "good" assets, and function as a temporary banking institution in BPA's absence. *Id.* ¶ 10. It actually served as a vehicle to funnel wealth away from the Shareholders. Vall Banc had a battery of council members running its operations, but it and BPA were 100% controlled by AREB. *Id.* This arrangement posed a conflict of interest that predictably resulted in AREB making decisions that benefitted Vall Banc but harmed BPA because AREB deliberately undervalued BPA's assets. The "good" assets transferred to Vall Banc from BPA reflected an official value of 70 million euros, but Vall Banc's own financial statement assessed those assets with a real value of 96.2 million euros. *Id.* ¶ 11. The transaction obscured a capital gain to Vall Banc of 26.2 million euros, and a theft in the same amount from the Shareholders.

The good asset transfer inured to the benefit of Vall Banc's new owner, JCF IV VB Holdings, S.à.r.l. ("JCF"), a Luxembourg entity. JCF is affiliated with J.C. Flowers & Co., a vulture fund in New York that specializes in buying distressed assets. It conducts business through its funds; J.C. Flowers IV L.P., a Cayman Islands fund, ("JCF Cayman") is the active fund, and has been raising capital and soliciting investors since its first offering in December 2015. *Id.* ¶ 12. On April 26, 2016, JCF Cayman entered into an agreement with AREB to acquire 30,000 shares of Vall Banc, constituting the entire share capital, for a total of 22 million euros. *Id.* ¶ 13. On June 15, 2016, JCF Cayman transferred all rights and obligations involving the Vall Banc shares to its new Luxembourg holding company, JCF. JCF completed payments for the Vall Banc shares on November 30, 2017. *Id.* ¶ 14. As of the end of 2017, JCF valued its equity in those shares at 64,049,000 million euros. *Id.*

It is not quite the case that Vall Banc received something from BPA for nothing. In return for BPA's assets, the legislation provided that AREB had to give BPA equal value for whatever was transferred to Vall Banc. In April 2016, AREB issued subordinated debentures on

Vall Banc's behalf, nominally worth 70 million euro, and delivered them to BPA. *Id.* ¶ 15. The debentures were on par with their nominal value, were perpetual and non-negotiable by BPA without approval, and had a 4% annual coupon payable in the exclusive discretion of the issuer. The debentures were mandatorily convertible into shares upon certain conditions, with 1.5% converting into ordinary shares and the rest into share premiums. There was no risk rating or other third party valuation. *Id.* ¶ 16. Nothing other than AREB saying so made these debentures worth 70 million euros.

On April 3, 2018, AREB approved the sale of the debentures to JCF for 12.8 million euros, less than twenty percent of the stated value of the debentures, confirming that AREB never intended for these securities to represent the real value of what had been taken from BPA. *Id.* ¶ 17. Inflating the value of the debentures and dumping them into BPA artificially raised the value of BPA and made it seem as though the government of Andorra, with its hastily formed agencies and gaggle of administrators, did an excellent job for BPA's shareholders, who had no say in the matter anyway. The effect of the sale of the debentures to JCF was to wipe the 70 million euro debt owed by Vall Banc to BPA for a fraction of the stated value. As the 100% owner of Vall Banc, this was a total windfall for JCF; it effectively received a capital gain of 57.2 million euros. Now, BPA has only 12.8 million euros, and Vall Banc has BPA's actual capital—the 96.2 million euro—transferred by AREB from BPA in 2016. AREB and JCF robbed BPA's shareholders in broad daylight.

**B. Legal Action Pending in the Andorran Magistracy Court**

Just because the transactions to gut BPA and harm its shareholders were approved by AREB does not mean that they were legal. The Shareholders now assert their right to the value of their shares in BPA and seek damages arising out of AREB and its agents' abuses of power

and sham transactions with JCF and Vall Banc. On September 27, 2018, petitioners filed a criminal lawsuit against the public officials and private entities involved in this heist in the Magistracy Court of Andorra, claiming 1) a major felony breach of official duty as an authority or civil servant; 2) two counts of a major felony of unfair administration of public heritage; 3) a major felony of unlawful association, and against JCF, money-laundering; 4) civil damages for the effects of the crimes. *Id.* ¶¶ 2-4.

**C. Evidence in This District**

The Shareholders bring this petition in order to obtain a subpoena against J.C. Flowers & Co., which maintains its headquarters in this district. J.C. Flowers & Co. is not a party to the Andorran action. J.C. Flowers & Co. functions as the nerve center for its funds and related holding companies, including JCF Cayman and JCF (Luxembourg). *Id.* ¶ 18. The CEO of Vall Banc is a Managing Director at J.C. Flowers & Co., and all press releases issued by AREB relating to the acquisition of Vall Banc refer to J.C. Flowers & Co. as the purchaser. *Id.* ¶¶ 19-20. Shareholders reasonably believe that J.C. Flowers & Co. has documents and communications relating to the decision to purchase of the shares of Vall, the decision to purchase the debentures from BPA, and the method of determining the price and valuation of each.

Petitioners seek non-privileged documents relating to the 1) acquisition of the Vall Banc shares; and 2) the purchase of the Vall Banc debentures from BPA. These are two discreet transactions, and their production would not pose a significant burden on J.C. Flowers & Co. Petitioners' claims center on the Andorran government's deception about the value of the Vall Banc debentures and the value of the assets transferred from BPA. The evidence in the possession of J.C. Flowers & Co. is therefore highly relevant to the Andorran action. It is

expected to show that AREB deliberately undervalued the good assets of BPA, artificially inflated the value of the debentures deposited in exchange for those assets, and then admitted the real value of the assets in the sale of those debentures back to the owner of Vall Banc. Documents and communications adducing these assertions will be prima facie evidence of AREB's abuse of power.

## LEGAL ARGUMENT

Section 1782 Applications must meet three statutory requirements. *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015). When an Application meets the statutory requirements, courts consider four discretionary factors, bearing in mind Section 1782's twin aims of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.* at 297-98 (quoting *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2d Cir. 2004)).

### A. The Application Meets All Three Statutory Requirements of 28 U.S.C. § 1782

The Shareholders' Application meets the three statutory requirements of Section 1782. The statute requires that: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Mees*, 793 F.3d at 297 (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)). The Shareholders' Application handily meets these requirements.

**1. J.C. Flowers & Co. "resides in" and is "found in" this District.**

J.C. Flowers & Co. maintains an office located at 767 Fifth Avenue, 23rd Floor, New York, NY 10153. Pallarés Decl. ¶ 18. The records sought by this Application are reasonably believed to be within their possession, custody or control. Respondent therefore resides and is found in the Southern District of New York, and the Shareholders' Application therefore meets Section 1782's first statutory requirement.

**2. The Shareholders' requested discovery is for use in a foreign proceeding in Andorra.**

The Shareholders' requested discovery is for use "in a proceeding" before "a foreign . . . tribunal." 28 U.S.C. § 1782. In analyzing this aspect of Section 1782, courts focus "on two questions: (1) whether a foreign proceeding is adjudicative in nature; and (2) when there is actually a foreign proceeding." *In re Application of Euromepa, S.A.*, 154 F.3d 24, 27 (2d Cir. 1998). The Shareholders have filed an action against AREB, Vall Banc, JCF, and their agents in the Magistracy Court of Andorra. The Magistracy Court, or *Batilla*, is the court of first instance in civil and criminal affairs. Pallarés Decl. ¶ 21. Each party is entitled to present evidence on its own behalf and to argue its case or defense before a neutral magistrate. *Id.* The litigation before the Andorran court is adjudicative in nature, and hence constitutes a "proceeding." The requested discovery is thus "for use in a proceeding [before] a foreign or international tribunal" within the meaning of Section 1782, meeting the Section's second requirement.

**3. The Shareholders are "interested person[s]," since they are plaintiffs in the foreign proceeding in Andorra.**

The Shareholders are "interested persons" for purposes of Section 1782. They are the plaintiffs who filed the complaint regarding the fraudulent conduct of AREB and the other defendants. The statutory term "interested person" encompasses parties and contemplated

parties to a foreign litigation. *See* 28 U.S.C. § 1782 (captioned "Assistance to foreign and international tribunals and to litigants before such tribunals"); *Intel v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) ("No doubt litigants are included among . . . the 'interested person[s]' who may invoke § 1782."); S. Rep. No. 1580, 88th Cong., 2d Sess. (1964) (stating that an "interested person" includes one who is a "party to . . . foreign or international litigation"); *cf. In re Application of Malev*, 964 F.2d 97, 101 (2d Cir. 1992) (noting that the phrase "upon the application of any interested person" was inserted into § 1782 "as part of the effort to liberalize the assistance provided by American courts to foreign and international tribunals"); *Mees*, 793 F.3d at 294, 304 (holding applicant contemplating suit "indisputably" was "interested person" under Section 1782).

For these reasons, the Shareholders meet the third and final statutory requirement of Section 1782, and thus the Court should turn to the discretionary factors outlined by the Supreme Court in *Intel*.

### B. The Application Should Be Granted in the Exercise of The Court's Discretion

The granting of this Application for judicial assistance is an appropriate exercise of this Court's discretion in aid of the contemplated proceeding before the Magistracy Court of Andorra. The Supreme Court set forth four factors to be considered in exercising discretion under Section 1782. *See Intel*, 542 U.S. at 264-65; *Mees*, 793 F.3d at 298.

First, a favorable exercise of discretion is most warranted where, as here, the respondent from whom discovery is sought is not a party to the foreign proceeding, because such a person "may be outside the foreign tribunal's jurisdictional reach" and "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264. This is an apt description of J.C. Flowers & Co., which is based in this district, is not named as a defendant in

the Andorran proceeding, and is therefore beyond the disclosure powers of the Andorran courts. Additionally, the Shareholders cannot rely on the Andorran executive agencies to provide diplomatic assistance in obtaining documents from J.C. Flowers & Co. because Shareholders are suing certain executive agencies in an action relating to exposing governmental corruption. It is highly unlikely that petitioners could obtain voluntary assistance from the Andorran executive in requesting disclosures through diplomatic channels.

Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id.* The Andorran proceeding is an appropriate subject of judicial assistance. The events giving rise to this lawsuit were precipitated by the presentation of evidence gathered by the U.S. Department of Treasury, which was then used by the government of Andorra as grounds to seize BPA. There is no reason to think that its executive departments are willing to accept evidence from the United States, but its courts are not. Andorra has a civil code based on the French and Spanish civil codes. Pallarés Decl. ¶ 22. The Second Circuit has observed that there are no authoritative declarations by French judicial, executive, or legislative body objecting to foreign discovery assistance, and any such objections could be addressed by excluding this evidence. *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 (2d Cir. 1995). So too with regard to Andorran courts. There are no declarations disapproving of U.S. judicial assistance in gathering evidence from the United States. Pallarés Decl. ¶ 22. Moreover, as discussed above, the proceeding before the Andorran court is quintessentially adjudicative, and the proceedings contemplate the involvement of the complaining party in the evidentiary proceedings. *Id*.

Third, the *Intel* Court has stated that a district court may consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States" and fourth whether the discovery requests are "unduly intrusive or burdensome." 542 U.S. at 264-65. The present Application seeks neither to circumvent foreign disclosure restrictions nor to impose onerous or unnecessary burdens on respondent, and it is unlikely to do so. Rather, the Application seeks the authorization to issue a subpoena for information for use in the pending Andorran proceeding from an entity that is not a party to that case. Specifically, shareholders seek to obtain from respondent documents and communications relating to two discrete transactions: the acquisition of the Vall Banc shares and the purchase of Vall Banc's debentures. A draft of the Shareholders' requests is attached as Exhibit A to the Declaration of Tara J. Plochocki. The requests are narrowly tailored to specific entities to elicit relevant information without unnecessarily burdening respondent.

The discretionary factors articulated by the Supreme Court therefore all weigh in favor of granting the Shareholders' Application.

## CONCLUSION

For the foregoing reasons, the Shareholders' Application for Judicial Assistance should be granted.

Respectfully submitted,

**LEWIS BAACH KAUFMANN MIDDLEMISS PLLC**

Dated: October 31, 2018

s/ Tara J. Plochocki
Tara J. Plochocki (NY Bar #5359054)
405 Lexington Avenue, 62nd Floor
New York, New York 10174
Tel: (212) 826 7001
tara.plochocki@lbkmlaw.com

Manuel S. Varela (*pro hac vice to be filed*)
1101 New York Avenue NW, 10th Floor
Washington, D.C. 20005
Tel: (202) 833-8900
manuel.varela@lbkmlaw.com